**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED-EDS
01 MAY 11 PM 3 08
CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| ANDREW PLOTKIN AS TRUSTEE FOR ZACHARY S. PLOTKIN TRUST DATED 12/17/95; ANDREW PLOTKIN AS TRUSTEE FOR NATALIE R. PLOTKIN TRUST DATED 12/17/95; ROBERT PLOTKIN AS BENEFICIARY OF ROBERT PLOTKIN IRA; ROBERT PLOTKIN IRA ROLLOVER DATED 11/10/99; ROBERT PLOTKIN; NANCY PLOTKIN; AND MANUEL PLOTKIN, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) ) |
| IP AXESS, INC., a Texas corporation formerly named DATA RACE, INC., d/b/a DATA RACE; MICHAEL A. McDONNELL; JAMES G. SCOGIN; LIVIAKIS FINANCIAL COMMUNICATION, INC., AND JOHN LIVIAKIS | ) ) ) ) ) ) ) |
| Defendants | ) ) |

**01C 3505**

Civil Action No.

SECURITIES COMPLAINT

JURY TRIAL DEMANDED



JUDGE ALESIA
MAGISTRATE JUDGE KEYS

DOCKETED

MAY 1 4 2001

<u>**COMPLAINT**</u>

Plaintiffs, by their undersigned attorneys, for their Complaint allege as follows upon personal knowledge as to themselves and their own acts, and, as to all other matters, upon the investigation conducted by their attorneys and by Robert Plotkin, including but not limited to reviews and analyses of public filings with the Securities and Exchange Commission, analyst reports, press releases and news articles, as follows:

/ — /

## NATURE OF THE ACTION

1.  This is a securities action on behalf of plaintiffs who were induced by misrepresentations and omissions of material fact concerning the fraudulent scheme affecting the present business and future prospects of the defendant company in deciding to purchase common stock of IP Axess, Inc. (formerly named Data Race, Inc.) d/b/a Data Race ("Data Race" or the "Company") between May 12, 2000 and September 1, 2000, inclusive (the "Stock Purchase Period").

2.  The defendant company and certain of its key senior officials, perhaps in concert with others presently unknown to plaintiffs, perpetrated the fraudulent scheme described in this complaint.  This scheme went on throughout the Stock Purchase Period, perhaps reaching its climax with the issuance of a false and misleading press release dated August 18, 2000.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

4.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 15 U.S.C. §

78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5.

5.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(b) and (c).  The Company is registered as a foreign corporation with the Illinois Secretary of State's office.  Many of the acts and the transactions constituting the violations of law alleged herein, including the dissemination of materially false and misleading statements to the investing public, occurred in this District.

6.  In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

### THE PARTIES

7.  Zachary S. Plotkin is the 11 year old grandson of plaintiff Robert Plotkin.  The plaintiff Andrew Plotkin as Trustee for the Zachary S. Plotkin Trust Dated 12/27/95 (the "Zachary Plotkin Trust") purchased 11,650 shares of Data Race common stock during the Stock Purchase Period and was damaged thereby.

8.  Natalie R. Plotkin is the nine year old granddaughter of plaintiff Robert Plotkin.  The plaintiff Andrew Plotkin as trustee for the Natalie R. Plotkin Trust Dated 12/27/95 (the

"Natalie R. Plotkin Trust") purchased 11,650 shares of Data Race common stock during the Stock Purchase Period and was damaged thereby.

9. Plaintiff Robert Plotkin, as beneficiary of the Robert Plotkin IRA, purchased 22,800 shares of Data Race common stock during the Stock Purchase Period. Robert Plotkin was also the beneficiary of the Robert Plotkin IRA Rollover dated 11/10/99 which purchased 14,000 shares of Data Race common stock during the Stock Purchase Period. Robert Plotkin also purchased 23,000 shares of Data Race common stock during the Stock Purchase Period. In connection with all of these transactions, Robert Plotkin was damaged thereby.

10. Plaintiff Nancy Plotkin, wife of plaintiff Robert Plotkin, purchased 6,000 shares of Data Race common stock during the Stock Purchase Period, as represented in the attached Certification, and was damaged thereby.

11. Plaintiff Manuel Plotkin is the brother of plaintiff Robert Plotkin. With his own funds, Robert Plotkin also purchased 10,000 shares of Data Race common stock during the Stock Purchase Period for his brother's account as represented in the attached Certification, and was damaged thereby.

12. Defendant Data Race is a Texas corporation with its executive offices and principal place of business located at 6509 Windcrest Blvd., Suite 120, Plano, Texas 75024. Data Race

- 4 -

designs, manufactures and markets a line of communication products for remote access to the corporate environment. These products give teleworkers access to all elements of corporate communications networks, including the Internet, Intranet and PBX.

13. Defendant Michael A. McDonnell joined the Company in November 1999, serving as the Chief Operating Officer from that time to the present. From April 2000 to the present he has also served as the Company's President and Chief Executive Officer and as a Director.

14. Defendant James R. Scogin joined the Company in 1997 as its Controller. He has served in that position from that time to the present. He has also served as Senior Vice President-Finance, Chief Financial Officer, Secretary and Treasurer from January 2000 to the present. For some time in the Stock Purchase Period he also served as the Company's Investment Relations officer.

15. Defendants Liviakis Financial Communication, Inc., a California corporation, and John Liviakis are "controlling shareholders" of the Company (collectively, "LFC")", having been the beneficial owners of at least 10% of the common stock during the Stock Purchase Period. According to the Company's 1999 annual report, LFC had entered into a consulting agreement with the Company in July 1998, whereby LFC had advised and assisted

- 5 -

the Company "in developing and implementing appropriate plans and materials for presenting the Company and its business plans, strategy and personnel to the financial community, and creating the foundation for subsequent financial public relations efforts." That agreement was later extended to January 2000.

16.  McDonnell, Scogin and LFC are collectively referred to herein as the Individual Defendants.

## THE DEFENDANTS' UNLAWFUL CONDUCT

17.  Throughout the Stock Purchase Period, the Company has concocted a calculated campaign to attract potential investors to purchase the Company's common stock or to induce investors to increase the amount of holdings of the said stock by issuing a series of false and misleading press releases, government filings and other public statements which have as their purpose the portrayal of the Company as a vibrant, growing company with tremendous prospects in the telecommunications field.  In these false and misleading press releases, government filings and other public statements, the Company notably touted the signing of alleged agreements with major corporate customers who were to purchase the Company's products.

18.  These false and misleading statements were intended to convey and did convey to the general investing public, including plaintiffs, and particularly Robert Plotkin who was instrumental in the decision to make or cause to be made all the purchases

- 6 -

described herein, that the Company was positioning itself to expand and market its products and services aggressively. Great growth and stock price appreciation were reasonably anticipated.

19. The false and misleading August and September 2000 press releases are perhaps the most extreme example of the fraudulent scheme carried out by defendants. But, they are part of a larger campaign carried out by the Company to deceive plaintiffs and the investing public. As release after release containing false and misleading information began to pile on itself, the campaign ultimately collapsed since the false and misleading information could no longer remain hidden and the true information about the Company's poor financial condition and resultant present business and future prospects came out.

## The Promised Shipments

20. One important prong of the fraudulent scheme included the knowing or reckless premature dissemination of information to the investing public that the Company soon planned to ship its products to its customers. When the Company made such an announcement, it knew or reasonably should have known or was reckless in failing to know that the Company would not be able to live up to this announcement, and that the mere announcement would cause the investing public to receive such information very favorably.

21. Another important prong of the fraudulent scheme was the knowing or reckless decision under the existing circumstances to include the revenues which would result from such shipments on the company's books as of the time of the shipment, instead of the time that the revenue was actually collected.

22. For example, on March 28, 2000, the Company announced that it had completed beta testing and planned to commence product shipments in the upcoming quarter.

> Today at VON (Voice On The Net 2000), DATA RACE (NASDAQ National Market: RACE) announced that it has completed beta tests of its broadband IP server solution, VocalWare IP, with leading customers. The solution provides customers with easy implementation of a Flexwork environment -- the ability to work anywhere, anytime, over any medium. (Emphasis added)
>
> **According to McDonnell, DATA RACE plans to begin shipping VocalWare IP in the second quarter of this calendar year, followed by additional product enhancements.**

23. The market reacted very favorably to news about upcoming shipments. Overnight the stock price jumped over 10% under heavy trading, over 2,000,000 shares.

24. Reacting favorably to that announcement and the message it reasonably and seemingly conveyed -- that the stock price would soon rise because of the promised shipments -- on May 12, 2000, Robert Plotkin purchased 1,000 shares for his own account and 14,000 shares for his IRA Rollover, at a price around $5.00/share.

## A Strategic Partnership, A Purchase Order
## And The May And June 2000 Stock Purchases

25. Later that month the Company made two watershed announcements, seemingly signalling its advancement from a mere "dot com" concept to a real company with substantial revenues and glowing future business prospects. On May 25, 2000, the Company reported that it had entered into a significant agreement with an international customer.

> IP AXESS, formerly DATA RACE, Inc. (NASDAQ National Market: RACE) today announced a letter of intent to enter into a strategic partnership with Associated Global Partners/Lynxus, Inc. (AGPI/Lynxus).

> Under terms of the agreement AGPI and Lynxus Inc. will be granted exclusive international marketing rights for IP Axess products for all business associated with the IP education solution opportunities in any country in which they are actively engaged in business partnerships. The agreement calls for an **annual commitment of $25 million dollars of net purchases from IP AXESS.**

> "Going forward, this strategic relationship with AGPI/Lynxus represents an **important component of IP Axess's worldwide distribution strategy,** and will enable us to expand our market opportunity by delivering the VocalWare IP technology to a broader range of customers," stated IP Axess President and CEO, Michael McDonnell. "AGPI/Lynxus's decision to market VocalWare IP as a best-of-breed solution confirms that IP Axess is on the way to becoming a recognized leader in remote communications technology."

26. That same day the Company also announced that it had received a multi-million dollar purchase order. That purchase order was to provide a substantial financial foundation for the Company's future growth.

> IP AXESS, formerly DATA RACE, Inc. (NASDAQ National
> Market, RACE) today announced **receipt of a $6.5 million
> purchase order** for the VocalWare IP remote work
> technology from AGPI/Lynxus, Inc. an application
> service provider which supplies internet access
> solutions to businesses, schools, churches and homes.

27.  These releases reasonably conveyed and were intended to convey to the investing public, including plaintiffs, that the Company was building a solid financial foundation and that the income and revenues from the purchase order and the partnership agreement would result in tremendous expansion opportunities in other areas with other customers.

28.  The market reacted favorably to this news.  More than twice as many shares were traded that day compared to the previous month's average.

29.  Although neither the investing public nor plaintiffs could have reasonably known at the time, the Company had prematurely made these announcements, without having a reasonable expectation to believe that it would actually collect all the amounts required to be paid under the agreement and purchase order.

30.  Nevertheless, the false and misleading press releases had the desired effect.  They created greatly inflated expectations about the Company's likely expansion and caused investors to sit up and take advantage of the ideal investing opportunity presented by a young company with expectant

- 10 -

significant and rising revenues and shares then priced at less than $5.00/share.

31. Robert Plotkin was very impressed by these announcements, and he was induced by them to actively plunge into the market. He caused his son Andrew, trustee of the Zachary Plotkin Trust and the Natalie Plotkin Trust, to purchase 5,0000 shares for each trust on May 26, 2000. That was not all. Robert Plotkin purchased 15,000 shares for his own brokerage account in two transactions on May 25-26, 2000. Furthermore, Robert Plotkin purchased 15,000 shares for the Robert Plotkin IRA account on May 26. All shares were purchased at prices ranging from approximately $4.60/share to less than $5.00/share. The total amount invested in connection with all these purchases was almost $100,000.

32. Within a week, more positive news was reported by the Company on the developing technology front. The Company "announced that beta customer installations of the new VocalWare IP integrated access media server are now being scheduled."

33. And the following week another product was touted and made available for beta testing.

34. The technological advancements and other May 2000 announcements referred to above favorably drew the attention of the investment community. On June 13, 2000, the Company stated:

> IP AXESS, formerly DATA Race, Inc. (NASDAQ National Market: RACE) today announced that it has closed a $6 million private equity placement. In this closing, six investors, including three investors from the Company's June 1999 and December 1999 private placements, have purchased approximately 1,572,738 shares of common stock and warrants to purchase approximately 471,822 additional shares.

35. Coming on the heels of the press releases describing the technological advancements, the institutional investor participation, the expectation of imminent commercial shipments, the agreements for future purchase and delivery of the Company's products and the developing cash pipeline was irresistible to the investing public. The stock surged as a result, exploding 65% in this two-week period to an intra-day high of almost $9/share. The investing public gobbled up shares with trade volume accelerating to more than 1.5 million shares traded each day.

36. Robert Plotkin was again induced by these announcements into making additional investments in the Company's stock and causing other family members to purchase additional shares. On June 6, Andrew Plotkin, trustee for the Zachary Plotkin Trust and the Natalie Plotkin Trust, purchased another 5,000 shares for each trust. The total amount invested for these purchases exceeded $65,000.

37. Robert Plotkin also caused his wife, Nancy Plotkin, to buy 3,000 shares on June 9, and he caused the Robert Plotkin IRA to purchase 5,800 shares on June 13. The total amount invested for these shares was $67,287.25.

38.  Furthermore, on June 6 Robert Plotkin with his own funds bought 5,000 shares of the Company's stock in his brother Manuel Plotkin's name with the intention that he (Manuel) would receive any profits resulting from the transaction, although the stock belonged to Robert Plotkin.  The total amount of this transaction was $32,546.75.  On June 8 Robert Plotkin bought another 5,000 shares of stock in his brother Manuel Plotkin's name with the same purpose in mind.  The total amount of this transaction was $39,165.50.

## New Business Associations And Executive Additions

39.  New potential business associations highlighted the Company's potential growth.  On June 20, 2000, the Company announced "that the United States Army Inspector General's Office is implementing the VocalWare IP remote access solution for its inspection teams."

40.  Another very important business partnership was made public on June 28 when the Company:

> "announced a strategic partnership with Time Warner Cable of San Antonio.  The partnership will enable the cable company to offer the VocalWare IP remote access solution to their end-user cable modem business accounts in the San Antonio area.
>
> As an IP AXESS strategic partner, Time Warner Cable of San Antonio will install the VocalWare IP servers on site at the business customer's location, implementing the virtual office capabilities to enhance and support the Work-at-Home programs that a number of

the Time Warner Cable business customers have."

41. Further creating the impression that the Company's present business and future prospects looked extremely promising were a series of personnel announcements heralding the addition of several key members to its sales, marketing and engineering executive staffs.

(A) On July 7, 2000 to deal with the anticipated business expansion, the Company announced:

> "Bradley Frohman has joined the Company as its Vice President of Engineering with responsibility for development groups in both the Plano and San Antonio offices.
>
> Frohman brings eighteen years of engineering experience in the communications industry to IP AXESS. His most recent positions include director of advanced wireless infrastructure products for Motorola, Inc., where he explored and delivered prototypes for cellular VoIP, distributed processing environments, and multi-RF technologies on IP networks. Prior to his position with Motorola, Frohman held technical positions Alcatel, Inc., formerly Digital Switch Communications, and Westinghouse Electric."

(B) On July 19, 2000, the Company announced:

> "Jeffrey C. Kissell has joined the Company as senior vice president of product and business development overseeing engineering, new technology, marketing, product planning and development.
>
> Prior to joining IP AXESS, Kissell served as vice president of national marketing for GTE Service Corporation. During his 22 year tenure with GTE, Kissell held various senior management positions in telecommunications, marketing services, product management and business development. His responsibilities included the development of marketing

programs, product design, pricing and distribution for GTE's domestic operations."

(C)  On July 25, 2000, the Company announced:

"Kenneth McCoppen has joined IP AXESS as Assistant vice president of direct sales and Michael Ongarato has joined as assistant vice president of channel sales.

McCoppen brings 20 years of experience in the technology industry to the company.  Prior to joining IP AXESS, McCoppen was financial services manager of LexMark International.  He has consistently been a top performer in various sales and management positions at name brand corporations.

'Mike and Ken bring to our company a proven track record of successfully designing and implementing direct and channel sales strategies on a global basis with large accounts,' said Michael McDonnell, IP AXESS's president and chief executive officer."

## The August 18, 2000 Press Release

42.  All of this set the stage for the Company's August 18, 2000 press release.  That release announced the signing of agreements with "major customers."  As is shown below, subsequent events have demonstrated that the Company's statement was false and misleading when made.  When the falsity of that statement became known in the market, the investing public sold off the Company's shares and the stock price dropped.  Plaintiffs sustained sizeable, substantial losses.

43.  On August 18, 2000, the Company issued a press release, a copy of which is appended hereto as Exhibit A and is incorporated herein by reference, which reads in part as follows:

**"Agreements In Place With Major Customers For Commercial Shipments In September, 2000."**

IP AXESS, formerly DATA RACE (Nasdaq: RACE-news), today announced that it has closed participation in the VocalWare IP integrated server beta program. **Customers participating in the beta trial include Time Warner Cable of San Antonio, Continental Airlines, Associated Global Partners/Lynxus, Inc., as well as a global carrier and an agency of the federal government. These first installments position IP AXESS to ship commercially available product in September 2000.**

\*   \*   \*   \*   \*

"The Enterprise Access Compact PCI Server is unparalleled in the scale, scope and flexibility of its design," said Michael McDonnell, IP AXESS's president and chief executive officer. "These organizations [the organizations referred to in the first paragraph] have established themselves as leaders in the application of remote access solutions and pioneers in the use of IP protocols to effectively converge voice and data connectivity. **We are excited about our beta partner's remote access application plans and commencement of shipment of the Enterprise Access Server (2G) to partners of such distinction.** We look forward to working closely with them as we begin implementation."

44. This press release was perceived by the investing public as an extremely positive development.

45. That the stock market was moved very positively by the release is shown by the fact that the price of the stock jumped more than 20% in just over two weeks. The closing price of the stock on the NASDAQ on August 17, the day before the release, was $5.156. The closing price of the stock on September 5 was $6.406.

## The Plaintiffs' Stock Purchases Induced
## By The August 18, 2000 Press Release

46. Among the many investors influenced positively by the August 18 press release was plaintiff Robert Plotkin. Because of the release, he caused the stock purchases described in the following three paragraphs to be made.

47. Robert Plotkin caused his son plaintiff Andrew Plotkin, Trustee of the Zachary Plotkin Trust, to purchase, with trust funds, 1,000 shares plus an additional 650 shares of Data Race stock, all on September 1, 2000 in reliance on the false and misleading press release. The total paid for these shares was $9,433.88.

48. Similarly, Robert Plotkin caused his son plaintiff Andrew Plotkin, Trustee of the Natalie Plotkin Trust, to purchase, with trust funds, 1,000 shares plus an additional 650 shares of Data Race stock, all on September 1, 2000 in reliance on the false and misleading press release. The total paid for these shares was $9,433.88.

49. In addition to the purchases described in the preceding two paragraphs which were made with trust money, Robert Plotkin made or caused to be made the following purchases in the following accounts for the benefit of his wife and himself:

| DATE | SHARES | PRICE | COST | ACCOUNT |
|------|--------|-------|------|---------|
| 8/23/00 | 7,000 | 6.125 | $42,978.00 | Robert Plotkin |
| 8/23/00 | 3,000 | 6.125 | 18,478.00 | Nancy Plotkin |

- 17 -

50. Nothing further was reported about these so-called "Agreements With Major Customers" until September 12 when the Company issued another press release confirming that **"agreements are in place with major customers for commercial shipments during that quarter."**

51. This information was again positively received by the investing public. As had been the case beforehand, the mention of these Agreements not only fortified the stock price, but pumped it up again -- over 6% for the day. Seven times as many shares traded that day compared to the previous day.

**The Disappearance Of The**
**"Agreements With Major Customers"**

52. After the September 12 press release was published, the so-called "Agreements With Major Customers" disappeared. That is, there was no further reference to them in any publication by the Company.

53. The Company's Annual Report to shareholders in the year 2000, issued months after the August 18 and September 12 press releases, do not mention any such Agreements and there was no mention of any product shipments.

54. The Company's filings with the SEC in the months after the August announcement do not mention the Agreements.

- 18 -

55. Plaintiffs watched the Internet, but there was no further mention of the Agreements by the Company.

56. So far as Robert Plotkin could find, there was no further mention of the Agreements by the Company anywhere. It was as though the entire matter had evaporated.

**The Stock Price Falls And The Company And Its Lawyers Refuse To Provide Information.**

57. Furthermore, the longer that nothing was heard about the said Agreements, the more the stock price deteriorated.

58. In the absence of any new information or explanation by the Company, Robert Plotkin sought information from the Company as to what happened to the "Agreements With Major Customers." All of this was completely without success. The Company, ultimately aided by its lawyers, stonewalled. Robert Plotkin vainly attempted to find out the sought-after information from the Company. The following excerpts from his correspondence describe his futile efforts:

A. Mr. Plotkin spoke on the telephone with the Company's Chief Financial Officer, defendant James Scogin, in late October or early November. On November 13, 2000, Robert Plotkin wrote a follow-up letter to defendant Scogin. Mr. Plotkin's letter requested:

> "I look forward to receiving your letter pursuant to our discussion last week. I think that your letter, in order to be meaningful, must include financial

- 19 -

information pertaining to the agreement with 'major customers' that was emphasized in the press release I sent you. The reason is clear: A million dollars in revenues is really insubstantial, but it acquires greater substance and meaning if it is shown to be just the beginning of greater and greater revenues provided for in those agreements with customers.

I must tell you that I am not the only shareholder in your company who now views that press release with great suspicion since, as far as I know, your company has never announced the details of those agreements.

Please provide those details to me. Remember, the press release implicitly represented that those agreements were really great stuff. I want to know if they are or if the press release was misleading on that ground."

B. Defendant Scogin replied on December 4, but failed to provide the requested information. On December 20, Mr. Plotkin asked again that the Company send him the information previously requested.

C. Mr. Plotkin followed up yet another time in January 2001:

"I will try one more time, because I have no great desire to file a lawsuit against you or your company; I will do so only if you fail to respond, or respond inadequately, to my requests for information. Your failures to respond thus far can only be taken as intended to conceal information that would disclose wrongdoing by the company."

He then suggested that defendant should have a company lawyer contact him.

D. A lawyer did respond in January 2001 to Mr. Plotkin's letter, but claimed that the Company had already provided the information. Mr. Plotkin followed up again on February 12:

> "I have repeatedly asked that the company **publicly** disclose material information relating to the agreements which were the subject of the press release I've referred to. The information should have been disclosed to everyone, including me.
>
> You are absolutely incorrect in stating that the company has provided information to me that is 'fully responsive' to my prior request. To contend otherwise diminishes your entire position."

No further communication has taken place and the information requested has never been publicly disclosed.

## New Agreements And The Cover-Up

59. While the Company persisted in failing to provide additional public information of the so-called Agreements with Major Customers, the Company continued to issue releases which falsely and misleadingly described its present business and future prospects. On October 19, 2000, the Company stated that:

> IP AXESS (Nasdaq: RACE-news) announced today that its first quarter revenues are in line with management projections.
>
> "As I committed to in our September 12th Webcast, revenues from our core product are estimated at $1.1 million," said Michael McDonnell, president and chief executive officer of IP AXESS. **"We are on the growth ramp that we projected and extremely optimistic regarding the revenue and margin potential for fiscal 2001."** (Emphasis added)

60. Another seemingly important agreement with another company was announced on October 26:

- 21 -

IP AXESS (Nasdaq: RACE-news) today announced a reselling agreement of the VocalWare IP remote work solution with Advanced Computer Concepts, Inc. of Arlington, Virginia, one of the capital's largest IT solutions providers.

Under terms of the agreement, Advanced Computer Concepts in conjunction with its 8a certified division, Bart Enterprise Solutions & Technologies (BEST), will sell IP AXESS's VocalWare IP product line to governmental agencies. BEST will utilize key relationships and GSA schedules already in place with federal agencies to market the VocalWare IP technology. Additionally, the company plans to use VocalWare IP internally.

*    *    *    *    *

"This relationship with Advanced Computer Concepts and BEST will significantly expand upon our federal government base. Furthermore, use of the GSA schedule will greatly facilitate purchases by federal, state and local government agencies and the sales resources of Advanced Computer Concepts will bring sales, service and support of the VocalWare IP remote access solution into a significant customer base throughout the US," said Michael McDonnell, president and chief executive officer of IP AXESS. "Advanced Computer Concept's strong relationships with key government accounts will help to accelerate IP AXESS sales to this key vertical segment."

## Restating Financial Information And The Independent Auditor's Resignation

61. Although the latter release was designed to and did again cause Data Race's stock price to heat up, cold water doused the situation three weeks later when the Company reported that, pursuant to its independent auditors' recommendation, a portion of its licensing revenues were reclassified to be recognized in future periods and most of its remaining reported revenues were not being recognized **because the Company had not received**

- 22 -

**payment**. On November 20, 2000, the Company announced that
because of the reclassifications due to the auditor's
recommendations:

> "total revenue from continuing operations for the three
> months ended September 30, 2000 **decreased by 97%** to
> approximately $6,000 from $183,000 in the same period
> of the prior fiscal year."

62. The next day, in addition to reporting that it would
not recognize revenue relating to its shipment of certain of its
products, the Company announced that its independent auditors
intended to resign:

> IP AXESS (Nasdaq: RACE-news) announced today that at
> the recommendation of KPMG LLP, its independent
> auditors, the Company will not recognize any revenues
> associated with its first quarter shipment of 35
> VocalWare servers and 840 VocalWare IP Clients valued
> at $701,000. These revenues will be recognized once
> payments for these products are received by the Company
> from the third party reseller. "Although the Company
> initially disagreed with the auditor's position, it
> determined that further argument and protest would not
> be in the best interest of the Company or its
> shareholders," said James G. Scogin, Senior Vice
> President-Finance and Chief Financial Officer.
> Although the Company ultimately complied with the
> auditors' recommendation, the auditors today informed
> the company that they intend to resign.

63. From the time of the original announcement, the Company
knew or had reasonably known that it was creating a misimpression
about the financial significance of the shipment and that it
would be incorrectly interpreted in the investing community.
Alternatively, the Company was reckless under the circumstances
in failing to recognize that a misimpression would result

- 23 -

concerning the significance of prematurely recognizing and reporting the revenue from these shipments even though the revenues had not actually been received.

64. When the dust cleared after these two announcements, the stock price plummeted 40% over just those two days to $1.50/share.

65. As of November 30 the price stood at $1.375. By year's end the stock price closed at **75 cents per share.**

66. On January 8, 2001, the Company reported that it had retained investor relations counsel to get out the word about the Company's "dramatic turn-around":

> Michael McDonnell, IP AXESS president and CEO, said, "We are pleased that Porter, LeVay & Rose will be helping us to educate and inform the financial community and news media about IP AXESS. <u>We have a fairly dramatic turn-around story across all aspects of our operations including product, process and sales. This advancement is reflected in new company name and ticker symbol, as we believe we are now on the path to success.</u> It's time to get the word out and Porter, LeVay & Rose will help us do that." (Emphasis added.)

67. By February 2001 public relations counsel issued a release that the May 2000 contract with Lynxus was also defunct and that **no revenues had been received** as of the date of the announcement of the default, more than eight months <u>after</u> the deal was first announced, the deal that had induced Robert Plotkin to make or cause to be made the stock purchases referred to in paragraphs 31 and 35-38.

- 24 -

> On May 25, 2000, IP AXESS announced a $6.5 million purchase order for VocalWare servers from AGPI and Lynxus and the intention to enter into a strategic partnership with them....
>
> IP AXESS began meeting its obligations under the agreement, and shipped $1 million worth of VocalWare product. We recognized this as revenue upon shipment, as was the company's historical practice and standard procedure. However, our independent auditors at the time protested this action and insisted we not recognize the revenue until payment was received.
>
> Unfortunately, Lynxus has informed us that they have experienced delays in receiving payment on one of its major programs. As a result, **we in turn will not be paid.**
> (Emphasis added)

Notwithstanding this news, investor relations counsel found a silver lining -- "The good news is that we have secured the return of the entire shipment."

68.  Nevertheless, the market did not share that interpretation. The price has steadily plummeted. The stock price, as of the close of business the day before this Complaint is being filed, is **65 cents per share.**

69.  At the present time, **plaintiffs' stock investments are worth approximately 13.53% of the average price paid for the same shares.** Plaintiffs have each lost thousands and thousands of dollars.

## SCIENTER

70.  The defendants acted with a fraudulent state of mind. The defendants knew throughout the Stock Purchase Period that

- 25 -

their press releases, government filings and other public statements were false and misleading, including but not limited to the so-called "Agreements With Major Customers," and that this fact would have a materially adverse affect on the Company's present business and future prospects. The defendants knowingly chose not to disclose this fact to the market and the investing public, including Robert Plotkin. The said releases and other statements were intended by defendants to maintain or increase the price of the Company's stock.

71. In the alternative to the allegation in the paragraph above, plaintiffs allege that throughout the Stock Purchase Period defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the press releases, government filings and other public statements made, including but not limited to the so-called "Agreements With Major Customers," although such facts were readily available to defendants and that this fact would have a materially adverse affect on the Company's present business and future prospects. The defendants knowingly chose not to disclose this fact to the market and the investing public, including Robert Plotkin. The said releases and other statements were intended by defendants to maintain or increase the price of the Company's stock.

72. As another alternative to the allegations in paragraphs 70 and 71 above, plaintiffs allege that throughout the Stock

Purchase Period defendants issued such false and misleading press releases, government filings and other public statements without having a reasonable or sufficient basis to do so, where the disclosure of such false and misleading information as was contained in the said press releases, government filings and other public statements was likely to mislead and defraud members of the investing public, including Robert Plotkin, and that this fact would have a materially adverse affect on the Company's present business and future prospects. The defendants unreasonably chose not to disclose this fact to the market and the investing public, including Robert Plotkin. The said releases and other statements were intended by defendants to maintain or increase the price of the Company's stock.

### COUNT I

[Against All Defendants For Violations Of
Section 10(b) And Rule 10b-5 Specifically
Relating To The Company's August And
September 2000 Press Releases]

73. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs and incorporate them here as if fully set forth herein.

74. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

- 27 -

75. Defendants engaged in a plan, scheme and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon plaintiffs, made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Stock Purchase Period, did: (a) conceal the adverse facts concerning the Company's present business and future prospects; (b) artificially inflate and maintain the market price of Data Race's common stock; and (c) cause plaintiffs to purchase Data Race's common stock at inflated prices.

76. Pursuant to the above plan, scheme, and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the press releases, government filings and other statements and other documents described above, including statements made to the investing public, among others, that were designed to influence the market for Data Race's common stock. Such press releases, government filings, and other statements and other documents described above were materially false and misleading in that they failed to disclose material adverse information and

- 28 -

misrepresented the truth about Data Race's present business and future prospects.

77. By virtue of their positions at the Company, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive plaintiffs or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the Company's President, Chief Executive Officer, Chief Operating Officer and Director and Senior Vice President-Finance, Chief Financial Officer of the Company, respectively, the Individual Defendants had knowledge of the details of the Company's internal affairs.

79. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants

were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or director of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's present business and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Data Race's stock was artificially inflated throughout the Stock Purchase Period. In ignorance of the adverse facts concerning Data Race's present business and future prospects which were concealed by defendants, plaintiffs purchased Data Race's common stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by defendants and were damaged thereby.

80. During the Stock Purchase Period, Data Race's common stock was traded on an active and efficient market. Plaintiffs, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Data Race's stock at prices artificially inflated by defendants' wrongful conduct. Had plaintiffs known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid. At the time of the purchases by plaintiffs, the true value of Data

Race's stock was substantially lower than the prices paid by plaintiffs. The market price of Data Race's common stock declined sharply upon public disclosure of the facts alleged in this complaint.

81. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10-5 promulgated thereunder.

WHEREFORE, the plaintiffs pray for relief from each of the foregoing defendants, jointly and severally, as hereinafter set forth.

## COUNT II

[Violations Of Section 20(a) Of The
Exchange Act Against The Individual
Defendants Specifically Relating To
The Company's August And September
2000 Press Releases]

82. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83. This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

84. (a) During the Stock Purchase Period, the Individual Defendants participated in the operations and management of the

Company, and conducted and participated, directly and indirectly, in the conduct of Data Race's business affairs. Because of the Individual Defendants' senior positions, they knew the adverse non-public information about Data Race's present business and future prospects.

(b) As directors and officers of a publicly-owned company, each had a duty to disseminate accurate and truthful information with respect to Data Race's financial condition and results of operations, and to correct promptly any public statement issued by Data Race which had become materially false or misleading.

(c) Because of their positions of control and authority as senior officers and/or directors of Data Race, each was able to, and did, control the contents of the various press release, government filings and other statements which Data Race disseminated in the marketplace during the Stock Purchase Period concerning the Company's present business and future prospects, relating specifically to the so-called "Agreements With Major Customers." Throughout the Stock Purchase Period, the Individual Defendants exercised their power and authority to cause Data Race to engaged in the wrongful acts complained herein. Therefore, each was a "controlling person" of Data Race within the meaning of Section 20(a) of the Exchange Act. In their respective capacities, they each participated in the unlawful conduct alleged which artificially inflated the market price of Data Race's common stock.

85. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20 of the Exchange Act for the violations by Data Race.

WHEREFORE, the plaintiffs pray for relief from each of the foregoing defendants, jointly and severally, as hereinafter set forth.

### COUNT III

[Against All Defendants For Violations Of The Illinois Consumer Fraud And Deceptive Business Practices Act Specifically Relating To The Company's August And September 2000 Press Releases]

86. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87. By reason of the facts set forth above, each of the defendants named in this count has engaged in deceptive acts and practices relating to the sales of merchandise (the above securities), in the conduct of such trade and commerce, and/or wrongfully participated in and/or knowingly received benefits of such acts and practices. Alternatively, each of the defendants named in this count is vicariously liable for such conduct.

88. Such deceptive acts and practices include the foregoing fraudulent and deceptive scheme, practices and conduct, including but not limited to material misrepresentations and omissions and

nondisclosures of material facts, and conduct which created a likelihood of confusion or misunderstanding.

89.  This conduct was undertaken with the intent that the plaintiffs would rely thereon or in such circumstances that defendants had a special reason to expect the plaintiffs to rely thereon.

90.  These fraudulent acts were wilful, wanton, oppressive and malicious.

91.  As a proximate result of such violations, the plaintiffs suffered actual damages in an amount to be determined at trial.

WHEREFORE, the plaintiffs pray for relief from each of the foregoing defendants, jointly and severally, as hereinafter set forth.

### COUNT IV

(Against All Defendants For Violations Of
Section 10(b) And Rule 10b-5 Promulgated
Thereunder Relating To The False And
Misleading Statements Affecting All Of
Plaintiffs' Purchases Of The Company's Stock

92.  Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs and incorporate them here as if fully set forth herein.

93.  This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

94.  Defendants engaged in a plan, scheme and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon plaintiffs, made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Stock Purchase Period, did: (a) conceal the adverse facts concerning the Company's present business and future prospects; (b) artificially inflate and maintain the market price of Data Race's common stock; and (c) cause plaintiffs to purchase Data Race's common stock at inflated prices.

95.  Pursuant to the above plan, scheme, and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the press releases, government filings and other statements and other documents described above, including statements made to the investing public, among others, that were designed to influence the market for Data Race's common stock. Such press releases,

government filings, and other statements and other documents described above were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Data Race's present business and future prospects.

96. By virtue of their positions at the Company, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive plaintiffs or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

97. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the Company's President, Chief Executive Officer, Chief Operating Officer and Director and Senior Vice President-Finance, Chief Financial Officer of the Company, respectively, the Individual Defendants had knowledge of the details of the Company's internal affairs.

- 36 -

98. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or director of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's present business and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Data Race's stock was artificially inflated throughout the Stock Purchase Period. In ignorance of the adverse facts concerning Data Race's present business and future prospects which were concealed by defendants, plaintiffs purchased Data Race's common stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by defendants and were damaged thereby.

99. During the Stock Purchase Period, Data Race's common stock was traded on an active and efficient market. Plaintiffs, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Data Race's stock at prices artificially inflated by defendants' wrongful conduct. Had plaintiffs known

the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid. At the time of the purchases by plaintiffs, the true value of Data Race's stock was substantially lower than the prices paid by plaintiffs. The market price of Data Race's common stock declined sharply upon public disclosure of the facts alleged in this complaint.

100. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10-5 promulgated thereunder.

WHEREFORE, the plaintiffs pray for relief from each of the foregoing defendants, jointly and severally, as hereinafter set forth.

### COUNT V

(Violations Of Section 20(a) Of The Exchange Act
Against The Individual Defendants Relating To The
False And Misleading Statements Affecting All Of
Plaintiffs' Purchases Of The Company's Stock

101. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102. This Count is asserted against defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

103.    (a)    During the Stock Purchase Period, the Individual Defendants participated in the operations and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Data Race's business affairs.    Because of the Individual Defendants' senior positions, they knew the adverse non-public information about Data Race's present business and future prospects.

(b)    As directors and officers of a publicly-owned company, each had a duty to disseminate accurate and truthful information with respect to Data Race's financial condition and results of operations, and to correct promptly any public statement issued by Data Race which had become materially false or misleading.

(c)    Because of their positions of control and authority as senior officers and/or directors of Data Race, each was able to, and did, control the contents of the various reports and press releases which Data Race disseminated in the marketplace during the Stock Purchase Period concerning the Company's present business and future prospects.    Throughout the Stock Purchase Period, the Individual Defendants exercised their power and authority to cause Data Race to engaged in the wrongful acts complained herein.    Therefore, each was a "controlling person" of Data Race within the meaning of Section 20(a) of the Exchange Act.    In their respective capacities, they each participated in the unlawful conduct alleged which artificially inflated the market price of Data Race's common stock.

104. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20 of the Exchange Act for the violations by Data Race.

WHEREFORE, the plaintiffs pray for relief from each of the foregoing defendants, jointly and severally, as hereinafter set forth.

## COUNT VI

[Against All Defendants For Violations Of
The Illinois Consumer Fraud And Deceptive
Business Practices Act Relating To The False
And Misleading Statements Affecting All Of
Plaintiffs' Purchases Of The Company's Stock]

105. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106. By reason of the facts set forth above, each of the defendants named in this count has engaged in deceptive acts and practices relating to the sales of merchandise (the above securities), in the conduct of such trade and commerce, and/or wrongfully participated in and/or knowingly received benefits of such acts and practices. Alternatively, each of the defendants named in this count is vicariously liable for such conduct.

107. Such deceptive acts and practices include the foregoing fraudulent and deceptive scheme, practices and conduct, including but not limited to material misrepresentations and

omissions and nondisclosures of material facts, and conduct which created a likelihood of confusion or misunderstanding.

108. This conduct was undertaken with the intent that the plaintiffs would rely thereon or in such circumstances that defendants had a special reason to expect the plaintiffs to rely thereon.

109. These fraudulent acts were wilful, wanton, oppressive and malicious.

110. As a proximate result of such violations, the plaintiffs suffered actual damages in an amount to be determined at trial.

## COUNT VII

[Against All Defendants For Common Law Fraud Relating To The False And Misleading Statements Affecting All Of Plaintiffs' Purchases Of The Company's Stock]

111. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112. By reason of the facts set forth above, all of the defendants, individually and in concert, directly and indirectly committed and participated in the fraud and deceit against the plaintiffs. Alternatively, each of the defendants is vicariously liable for such conduct.

113.   The said unlawful conduct was committed by the defendants with the intent to deceive and defraud the plaintiffs or with reckless disregard of the truth so as to constitute intent to deceive and defraud.   The false and misleading statements and/or omissions of material facts and/or nondisclosures in violation of a duty to disclose were made by defendants with the intent to deceive or defraud the plaintiffs or were made with reckless indifference to the truth so as to constitute intent to deceive and defraud.

114.   As a proximate result of such violations, the plaintiffs suffered actual damages in the amount set forth above.

115.   These fraudulent acts were wilful, wanton, oppressive and malicious.

WHEREFORE, the plaintiffs pray for relief from each of the foregoing persons, jointly and severally, as hereinafter set forth.

A.   Requiring defendants to pay damages sustained by plaintiffs by reason of the acts and transactions alleged herein;

B.   Awarding plaintiffs punitive damages in an amount of at least $20 million;

C.   Awarding plaintiffs prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

Dated:   May 11, 2001

ZACHARY S. PLOTKIN TRUST DATED
12/17/95 AND ANDREW PLOTKIN AS
TRUSTEE THEREOF; NATALIE R. PLOTKIN
TRUST DATED 12/17/95 AND ANDREW
PLOTKIN AS TRUSTEE THEREOF; ROBERT
PLOTKIN AS BENEFICIARY OF ROBERT
PLOTKIN IRA; ROBERT PLOTKIN
IRA ROLLOVER DATED 11/10/99;
ROBERT PLOTKIN; NANCY PLOTKIN;
AND MANUEL PLOTKIN

By _____
One of Plaintiffs' Attorneys

Lee J. Schwartz
30 North LaSalle Street
Suite 2900
Chicago, Illinois  60602
(312) 263-5013


Steven J. Plotkin
Plotkin & Plotkin LLC
200 South Michigan Avenue, Suite 1210
Chicago, Illinois 60604
(312) 372-0001

- 43 -

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all claims that can be so tried.

Dated:  May 11, 2001

ZACHARY S. PLOTKIN TRUST DATED
12/17/95 AND ANDREW PLOTKIN AS
TRUSTEE THEREOF; NATALIE R. PLOTKIN
TRUST DATED 12/17/95 AND ANDREW
PLOTKIN AS TRUSTEE THEREOF; ROBERT
PLOTKIN AS BENEFICIARY OF ROBERT
PLOTKIN IRA; ROBERT PLOTKIN
IRA ROLLOVER DATED 11/10/99;
ROBERT PLOTKIN; NANCY PLOTKIN
AND MANUEL PLOTKIN

By _____
One of Plaintiffs' Attorneys

Lee J. Schwartz
30 North LaSalle Street
Suite 2900
Chicago, Illinois  60602
(312) 263-5013

Plotkin & Plotkin LLC
200 South Michigan Avenue
Suite 1210
Chicago, Illinois 60604
(312) 372-0001

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

ANDREW PLOTKIN AS TRUSTEE FOR

**I. (a) PLAINTIFFS** ZACHARY S. PLOTKIN AND NATALIE R. PLOTKIN TRUSTS DATED 12/17/95; ROBERT PLOTKIN AS BENEFICIARY OF ROBERT PLOTKIN IRA; ROBERT PLOTKIN IRA ROLLOVER DATED 11/10/99; ROBERT PLOTKIN; NANCY PLOTKIN; AND MANUEL PLOTKIN (EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS** IP AXESS, INC. d/b/a DATA RACE, MICHAEL MCDONNELL AND JAMES G. SCOGIN AND LIVIAKIS FINANCIAL COMMUNICATION, INC., AND JOHN LIVIAKIS

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    COOK

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

*Cat 2*

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
LEE J. SCHWARTZ          PLOTKIN & PLOTKIN LLC
30 N. LASALLE ST.        200 S. MICHIGAN AVE.
SUITE 2900               SUITE 1210
CHICAGO, IL 60602        CHICAGO, IL 60604

ATTORNEYS (IF KNOWN)

# 01C 3505

JUDGE ALESIA    MAGISTRATE JUDGE KEYS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
XX 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

DOCKETED
MAY 1 4 2001

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

MAY 1 4 2001

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | PROPERTY RIGHTS | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☒ 810 Selective Service |
| | | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | LABOR | SOCIAL SECURITY | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | FEDERAL TAX SUITS | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. Sec.78j(b) and Rule 10b-5 and 15 U.S.C. Sec.78t(a) securities fraud case induced by misrepresentations and omissions of material fact

## VII. REQUESTED IN COMPLAINT

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint
JURY DEMAND:  XX Yes  ☐ No

## VIII. This case

☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE  May 11, 2001

SIGNATURE OF ATTORNEY OF RECORD
*Lee J. Schwartz*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of ANDREW PLOTKIN AS TRUSTEE
FOR ZACHARY S. PLOTKIN TRUST DATED 12/17/95
ET AL.          v.
IP AXESS, INC. d/b/a DATA RACE et al.

**JUDGE ALESIA**

Case Number: **01C 3505**

**MAGISTRATE JUDGE KEYS**

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

ANDREW PLOTKIN AS TRUSTEE FOR ZACHARY S. PLOTKIN AND NATALIE R. PLOTKIN TRUST
DATED 12/17/95; ROBERT PLOTKIN AS BENEFICIARY OF ROBERT PLOTKIN IRA; ROBERT
PLOTKIN IRA ROLLOVER DATED 11/10/99; ROBERT PLOTKIN; NANCY PLOTKIN; AND MANUE
PLOTK

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| **DOCKETED** | NAME STEVEN J. PLOTKIN, ESQ. |
| NAME LEE J. SCHWARTZ, ESQ. | FIRM PLOTKIN & PLOTKIN LLC |
| **MAY 14 2001** | STREET ADDRESS 200 SOUTH MICHIGAN - SUITE 1210 |
| FIRM | CITY/STATE/ZIP CHICAGO, IL 60604 |
| STREET ADDRESS 30 N. LASALLE STREET - SUITE 2900 | TELEPHONE NUMBER (312) 372-0001 / FAX NUMBER (312) 372-5298 |
| CITY/STATE/ZIP CHICAGO, IL 60602 | E-MAIL ADDRESS |
| TELEPHONE NUMBER (312) 553-5050 / FAX NUMBER (312) 263-5013 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 2219778 |
| E-MAIL ADDRESS | MEMBER OF TRIAL BAR? YES ☐ NO ☒ |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 2-524198 | TRIAL ATTORNEY? YES ☐ NO ☐ |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | |

| (C) | (D) |
|---|---|
| | SIGNATURE |
| SIGNATURE | NAME |
| NAME | FIRM |
| FIRM | STREET ADDRESS |
| STREET ADDRESS | CITY/STATE/ZIP |
| CITY/STATE/ZIP | TELEPHONE NUMBER / FAX NUMBER |
| TELEPHONE NUMBER / FAX NUMBER | E-MAIL ADDRESS |
| E-MAIL ADDRESS | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | |